FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                                          :
In re                                                     :     Chapter 11 Case No.
                                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :     08-13555 (JMP)
              Debtors.                             :     (Jointly Administered)
-------------------------------------------------------------------x
                                                          :
FIRSTBANK PUERTO RICO,                        :     Adv. Proc. No. 10-04103(JMP)
              Plaintiff,                                  :
                                                          :
v.                                                        :
                                                          :
BARCLAYS CAPITAL INC.,                         :
              Defendant.                             :
-------------------------------------------------------------------x

**MEMORANDUM DECISION DENYING MOTION FOR SUMMARY JUDGEMENT OF FIRSTBANK PUERTO RICO AND GRANTING MOTION FOR SUMMARY JUDGMENT OF BARCLAYS CAPITAL INC.**

DICKSTEIN SHAPIRO LLP
*Attorneys for FirstBank Puerto Rico*
1633 Broadway
New York, New York 10019

    Jeffrey A. Mitchell, Esq.
    Judith R. Cohen, Esq.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for Barclays Capital Inc.*
One Liberty Plaza
New York, New York 10006

    Lindsee P. Granfield, Esq.
    Boaz S. Morag, Esq.


JAMES M. PECK
United States Bankruptcy Judge

*Introduction*

Plaintiff FirstBank Puerto Rico ("FirstBank") wants its property back. It complains that certain securities pledged more than ten years before the bankruptcy to Lehman Brothers Special Financing, Inc. ("LBSF") to secure a routine interest rate swap agreement were transferred from its swap counterparty to LBSF's broker-dealer affiliate Lehman Brothers Inc. ("LBI") and then sold by LBI to Barclays Capital Inc. ("Barclays") when these securities were swept into and became part of the complex sale of financial assets to Barclays that occurred with such amazing speed immediately after commencement of these bankruptcy cases. FirstBank has sued Barclays for the return of the pledged securities.

FirstBank asserts that LBI had no right to sell property it did not own and also argues that these securities were not within the category of assets acquired by Barclays under the language of the relevant transaction documents and, accordingly, are not entitled to benefit from the protections of the bankruptcy court order approving the sale (the "Sale Order"). FirstBank is not the first Lehman counterparty to seek relief from the Sale Order on legal or equitable grounds. Like others that previously have presented similar arguments, its attempts to distance itself from the impact of the Sale Order are unpersuasive.

FirstBank has tried to distinguish its claims against Barclays and to treat them as if they are not directly related to the Lehman bankruptcy cases. Perhaps for that reason, Plaintiff initially commenced its lawsuit against Barclays in the United States District Court for the Southern District of New York (the "District Court"). Case No. 09-cv-10317, ECF No. 1. In its six-count complaint filed on December 21, 2009, FirstBank seeks to recover twenty securities with identified CUSIP numbers (the "Disputed Securities") originally deposited with LBSF

2

under the terms of a governing ISDA Master Agreement with an attached Schedule and Credit Support Annex ("CSA") (collectively, the "Swap Agreement").

The Disputed Securities were pledged in connection with the Swap Agreement but did not remain with LBSF. At various times, they were transferred to other holders as a result of intervening repurchase agreement transactions that were permissible under the Swap Agreement. Such transfers by means of repos are consistent with routine financing practices on Wall Street. After the Disputed Securities were in LBI's control, they ended up being packaged with a multitude of other similar securities and were included in the vast pool of financial assets subsequently acquired by Barclays pursuant to the Sale Order. This pooling occurred without regard to or consideration of the ownership claims of FirstBank. The factual background section of this decision sets forth in more detail the circumstances that led to inclusion of the Disputed Securities in the assets acquired by Barclays.

The litigation seeking to recover the Disputed Securities proceeded for a period of time in the District Court before being referred to this Court. On May 3, 2010, the District Court granted in part and denied in part Barclays' motion to dismiss the FirstBank complaint. Case No. 09-cv-10317, ECF No. 22. Following the District Court's ruling, the surviving claims include unjust enrichment, constructive trust/accounting, and conversion. Four months later, the District Court granted a motion by Barclays to refer the litigation to the bankruptcy court, holding that the dispute is a core proceeding. Case No. 09-cv-10317, ECF No. 44. The District Court found that because the Sale Order "ostensibly transferred the collateral at issue from Lehman to [Barclays][,] … any remaining rights that [FirstBank] has in the collateral would need to be determined by analyzing the [e]ffect" of the Sale Order. Id at 2.

Following transfer to this Court, this litigation has taken on the character of a Lehman-related adversary proceeding. The parties completed discovery and have fully briefed and argued their cross-motions for summary judgment. The arguments presented focus particular but not exclusive attention on the question identified by the District Court – the impact of the Sale Order on FirstBank's ability to recover the Disputed Securities from Barclays.

Despite FirstBank's ardent advocacy of its position, such advocacy has its limits. The Court finds, just as it has in other similar cases involving challenges to the protections of the Sale Order, that Barclays is immune from attack and has no obligation to return the Disputed Securities to FirstBank. This result is mandated by the inescapable conclusion that the Disputed Securities properly fit within the definition of Purchased Assets (i.e., the assets acquired by Barclays) under the terms of the APA and Clarification Letter (each as defined below).[1] FirstBank strains to argue otherwise, but is unable to counter the preclusive effect of the Sale Order when read in conjunction with these transaction documents. For the reasons stated, Barclays is entitled to the entry of judgment in its favor, and the motion of FirstBank is denied.

*Standard*

Summary judgment is appropriate where there is "no genuine dispute as to any material fact," and the moving party is entitled to "judgment as a matter of law." Fed. R. Civ. P. 56(a); *see NML Capital v. Republic of Argentina*, 621 F.3d 230, 236 (2d Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Redd v. Wright*, 597 F.3dd 532, 535-36 (2d Cir. 2010)). The court must view the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all inferences against the moving party. *See NetJets Aviation, Inc. v. LHC Communs., LLC*, 537 F.3d 168, 178 (2d Cir. 2008) (citing *Liberty Lobby*,

---

[1] In ruling on the motion to dismiss, the District Court, as it was required to do under Federal Rule of Civil Procedure 12(b)(6), assumed as true FirstBank's allegation that the Disputed Securities were not Purchased Assets.

4

477 U.S. at 255; *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991)). In determining whether to grant a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Liberty Lobby*, 477 U.S. at 249 (internal quotation marks omitted)). Here, the Motion for Summary Judgment presented by Barclays easily satisfies this strict standard.

*Factual Background*

Because this is a core proceeding, prior rulings of this Court made in connection with these chapter 11 cases and the liquidation of LBI under the Securities Investor Protection Act ("SIPA") constitute the law of the case. *See Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.)*, 303 F.3d 161, 168 n.13 (2d Cir. 2002) (noting that a "'case' triggered by a bankruptcy petition is an 'umbrella litigation often covering numerous actions that are related only by the debtor's status as a litigant[,]'" while the term "proceeding," as used in the bankruptcy context, "embraces all controversies determinable by the court of bankruptcy and all the matters of administration arising during the pendency of the case") (*citing Sonnax Indus. v. Tri Component Prods. Corp. (In re Sonnax Indus.)*, 907 F.2d 1280, 1283 (2d Cir. 1990); 2 Collier on Bankruptcy ¶ 301.03 (15th ed. rev. 2001) (internal parenthetical omitted))). The undisputed facts relevant to the current dispute are derived from the parties' submissions in connection with this adversary proceeding and the content of earlier proceedings and decisions of the Court.[2]

---

[2] In particular, the Court looks to *In re Lehman Brothers Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011), the opinion that resolved challenges by LBHI and the SIPA Trustee (defined below) to the amount of consideration received for assets transferred to Barclays under the September 18 Repurchase Agreement (defined below) and the integrity of various aspects of the sale to Barclays. Also relevant to the analysis is the Court's unpublished Memorandum Decision in adversary proceeding number 08-01633 (JMP), *Evergreen Solar, Inc. v. Barclays PLC et al.* [ECF No. 47], 2011 Bankr. LEXIS 629 (Bankr. S.D.N.Y. Feb. 22, 2011), granting defendants' motions to

On January 16, 1997, FirstBank and LBSF entered into the Swap Agreement. Stip. ¶ 2, Exs. 1, 2.[3] Lehman Brothers Holdings Inc. ("LBHI") guaranteed LBSF's obligations under the Swap Agreement. Stip. ¶ 2. The parties amended the applicable ISDA Master Agreement as of June 19, 2008. Stip. ¶ 4. Pursuant to the CSA and in order to provide agreed credit support, FirstBank was required to post specified types of collateral to secure all of its obligations under the Swap Agreement. Stip. Ex. 3 (CSA).

As of September 15, 2008, the collateral posted by FirstBank to LBSF as Secured Party under the CSA consisted of positions in twenty-three securities with identified CUSIP numbers (the "Posted Collateral"), including the twenty Disputed Securities. Stip. ¶¶ 6, 7. Under paragraph 6(c) of the CSA, LBSF was permitted to use the Posted Collateral, provided that "the Secured Party [was] not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date [had] occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party." Stip. ¶ 9, Ex. 3 ¶ 6(c). Specifically, LBSF, as Secured Party under the CSA, had "the right to … sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of [FirstBank], including any equity or right of redemption by [FirstBank]." Stip. Ex. 3 ¶ 6(c).

---

dismiss plaintiff's amended complaint seeking to recover certain shares of plaintiff's own common stock that plaintiff claimed had been transferred improperly to Barclays under the Sale Order.
Barclays and the SIPA Trustee appealed certain aspects of the Court's ruling in *In re Lehman Brothers Holdings Inc.*, but no party pursued an appeal of the Court's denial of Rule 60(b) relief. Accordingly, that aspect of the decision is final.
The District Court affirmed the Court's opinion in part with respect to assets that had been in dispute between Barclays and the SIPA Trustee and reversed in part as to issues not relevant to this adversary proceeding. *See Barclays Capital Inc. v. Giddens (In re Lehman Bros. Inc.)*, 478 B.R. 570 (S.D.N.Y. 2012). Appeals from the District Court's decision are pending before the Second Circuit. *See In re Lehman Brothers Holdings Inc.*, Court of Appeals Nos. 12-2322, 12-2328, 12-2657. The Second Circuit has scheduled oral argument on these matters for May 29, 2013.
[3] References to "Stip." are to the parties' Stipulations of Fact. Adv. Proc. No. 10-4103, ECF No. 19.

As was permitted under the terms of the CSA, between February 6, 2008 and September 12, 2008, LBI acquired the Disputed Securities in a series of open repurchase transactions with LBSF (the "LBSF-LBI Repos"). Stip. ¶ 12. The LBSF-LBI Repos were governed by a Master Repurchase Agreement (the "Lehman MRA") under which title to the Disputed Securities passed to LBI. BCI Facts[4] ¶ 25; Stip. Ex. 6 ¶ 8. The Lehman MRA further provided that, subject to certain limitations, "nothing in this Agreement shall preclude [LBI] from engaging in repurchase transactions with the [Disputed Securities] or otherwise pledging or hypothecating the [Disputed Securities]." Id.

Under the terms of the Lehman MRA, LBSF had the right (but not the obligation) to repurchase the Disputed Securities. To that end, the Lehman MRA included a close-out provision requiring LBSF to tender the defined Repurchase Price in immediately available funds. BCI Facts ¶ 29; Stip. Ex. 6 ¶¶ 2(o), 3(c), 7. LBI documented the LBSF-LBI Repos in its stock ledger for U.S. dollar-denominated fixed-income instruments and in trade confirmations provided to LBSF stating that LBI had bought the Disputed Securities from LBSF and listing the prices paid by LBI to LBSF in immediately available funds. Stip. ¶¶ 11, 12; Stip. Exs. 5, 6, 40; BCI Facts ¶¶ 19 n.3, 21, 24.

On September 15, 2008, LBSF failed to make a net payment due under the Swap Agreement, and this failure to pay constituted an event of default. Stip. ¶ 32, Ex. 9. On that same day, LBHI and certain of its subsidiaries[5] each filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Filing for relief under the Bankruptcy Code was an event of default under the Swap Agreement. Stip. Ex. 9. By virtue of

---

[4] All references to "BCI Facts" are to Barclays Capital Inc.'s Statement of Undisputed Facts Pursuant to Local Rule 7056-1 in Support of Its Motion for Summary Judgment. Adv. Proc. No. 10-4103, ECF No. 18.
[5] LBSF is a subsidiary of LBHI, but did not file its own chapter 11 petition until October 3, 2008. Stip. ¶ 26. At times, the Court refers to LBHI together with its debtor and non-debtor subsidiaries and affiliates as "Lehman."

this event of default, LBSF's right to use the Posted Collateral under the CSA terminated on September 15, 2008 (the "Collateral Use Cutoff Date"). Stip. ¶ 9. Accordingly, the LBSF-LBI Repos, all of which occurred prior to the Collateral Use Cutoff Date, constituted permissible exercises of the right of LBSF as swap counterparty to dispose of the Posted Collateral "free from any claim or right of any nature whatsoever of [FirstBank], including any equity or right of redemption by [FirstBank]." Stip. ¶¶ 9, 12, Ex. 3 ¶ 6(c).

Following the LBHI bankruptcy filing, the New York Fed provided financing to LBI through a series of short-term funding agreements (collectively, the "Fed Repo") that enabled LBI to continue operating as a broker-dealer for a limited period of time. *In re Lehman Brothers Holdings Inc.*, 445 B.R. at 170. The terms of the Fed Repo required LBI to post collateral to the New York Fed. Id. Upon subsequently learning that LBHI, LBI and Barclays contemplated entering into a transaction (the "Sale Transaction") for the acquisition of Lehman's North American broker-dealer and investment banking operations, the New York Fed became insistent that it be immediately relieved of its short-term financing role for LBI and that Barclays take on the role of providing such financing. Id.

Barclays assumed this role under an agreement with the New York Fed (the "Take-Out Agreement") that was signed on September 17, 2008. In the Take-Out Agreement, Barclays agreed to step into the shoes of the New York Fed and to purchase all assets that were included within the Fed Repo. *In re Lehman Brothers Holdings Inc.*, 445 B.R. at 170 n. 13. On the morning of September 18, 2008, an unwinding of the Fed Repo took place, and the New York Fed returned to LBI all securities that had been pledged as collateral (including the Disputed Securities). Stip. ¶ 19. LBI held the Disputed Securities in an account identified as the "LBSF Collateral Repo Account" and designated them as having been received under a reverse repo on

8

its books and records. FirstBank Resp. BCI Facts ¶¶ 25, 26.[6] LBI then entered into a separate repurchase transaction with Barclays (the "September 18 Repurchase Agreement") under which Barclays advanced approximately $45 billion in cash to LBI in exchange for the transfer of a diversified inventory of financial assets that included the Disputed Securities. Stip. ¶ 20.

On September 19, 2008, the District Court entered an Order regarding liquidation of LBI, appointed a trustee for LBI (the "SIPA Trustee") and referred the LBI liquidation to this Court. Adv. Proc. No. 08-01420, ECF No. 1. Later that same day, the Court conducted a hearing (the "Sale Hearing") to consider approval of the proposed sale to Barclays on an emergency basis. The Sale Hearing was an exceptional event in the history of insolvency law and was held jointly in both the LBHI chapter 11 case and the SIPA liquidation that had been commenced just hours before the start of the Sale Hearing.[7]

The Sale Hearing extended into the early morning hours of September 20. At the conclusion of the Sale Hearing, the Court approved the acquisition by Barclays and entered the Sale Order dated as of September 19, 2008.[8] Stip. ¶ 23, Ex. 8. In the Sale Order, the Court found, among other things, that Barclays was a "good faith Purchaser" and had "proceeded in good faith in all respects in connection with" the Sale Transaction. Stip. Ex. 8 ¶ K. The Sale Order also provided that the transfer of the Purchased Assets would "be a legal, valid and effective transfer of the Purchased Assets … free and clear of all Liens, claims … or interests of any kind or nature whatsoever … ." Stip. Ex. 8 ¶ N.

---

[6] References to "FirstBank Resp. BCI Facts" are to Plaintiff's Responses to Barclays Capital Inc.'s Statement of Undisputed Facts Pursuant to Local Rule 7056-1 in Support of its Motion for Summary Judgment and Statement of Additional Material Facts. Adv. Proc. No. 10-4103, ECF No. 41.

[7] As of the date of the Sale Hearing, the Sale Transaction had been memorialized in an asset purchase agreement, dated as of September 16, 2008 (the "APA"). *Evergreen Solar,* 2011 Bankr. LEXIS 629, at *10.

[8] On October 17, 2008, Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2, and Institutional Benchmarks prosecuted an appeal of the Sale Order in the District Court. On March 13, 2009, the District Court issued its Opinion & Order affirming the Sale Order. District Court Case No. 08-cv-08869, ECF No. 18; District Court Case No. 08-cv-08914, ECF No. 19.

After entry of the Sale Order, on September 22, 2008, Barclays, LBHI, LBI and LB 745 LLC filed on the docket of the LBHI bankruptcy case a letter agreement dated as of September 20, 2008 purporting to clarify, modify and supplement the terms and conditions set forth in the APA (the "Clarification Letter").[9] Stip. ¶ 24. The Clarification Letter provided that the rights and obligations of the parties under the Fed Repo would terminate, and all securities held by Barclays under the September 18 Repurchase Agreement would be deemed part of the Purchased Assets. *Evergreen Solar*, 2011 Bankr. LEXIS 629, at *10. The Clarification Letter also provided that the Purchased Assets would include "the securities owned by LBI and transferred to [Barclays] or its Affiliates under the [September 18] Repurchase Agreement … as specified on Schedule A previously delivered by Seller and accepted by [Barclays]." Morag Decl.[10] Ex. 22 ¶ 1(a)(ii)(A). Schedule A includes CUSIP numbers and par values for the Disputed Securities. Stip. ¶ 22.

On September 29, 2008, Barclays and Lehman filed a joint motion for authorization to file Schedule A under seal. Stip. ¶ 28. In that motion, Barclays and Lehman stated that they were "willing to provide the Schedules to creditors who sign a confidentiality agreement." Id. The Court granted the sealing motion and issued an order to that effect dated December 17, 2008; Schedule A was filed under seal on December 18, 2008. Id. Thus, information regarding the Disputed Securities was available to any interested party, including FirstBank, provided that the party seeking discovery entered into a confidentiality agreement.

FirstBank attempted through counsel to learn the location of its collateral from Lehman and its counsel following LBSF's filing of its chapter 11 petition. BCI Facts ¶ 54. From

---

[9] The Clarification Letter was not formally approved, but the Court has determined that it is enforceable nonetheless. *In re Lehman Brothers Holdings Inc.*, 445 B.R. at 151.
[10] References to "Morag Decl." are to the Declaration of Boaz S. Morag in Support of Barclays' Motion for Summary Judgment dated September 13, 2012. Adv. Proc. No. 10-4103, ECF No. 16.

10

approximately March 31, 2009 through July 23, 2009, FirstBank and Lehman personnel engaged in a closeout process of the Swap Agreement. The parties exchanged data and analyses; this exchange culminated in FirstBank's being informed by Lehman that (i) the Posted Collateral had been rehypothecated and was no longer under Lehman's control, (ii) Lehman was crediting a portion of the Posted Collateral against the net termination amount owed by FirstBank to LBSF and (iii) FirstBank would need to file a claim "against the estate" as to the excess collateral. BCI Facts ¶¶ 55-60; Morag Decl. Ex. 57.

As part of this process, Lehman also informed FirstBank that if it wished to argue that it should "become senior to the other creditors with respect to [its] excess collateral," it would need to file a motion with the Court. Morag Decl. Ex. 58. Inexplicably, FirstBank elected not to participate in the chapter 11 cases. It has not filed a proof of claim against its counterparty, LBSF, or LBSF's guarantor, LBHI.[11] BCI Facts ¶ 76. FirstBank also has not filed any motion in the LBSF or LBHI bankruptcy cases relating to treatment of its excess collateral. Id. This failure by FirstBank to assert any claims against the chapter 11 debtors is remarkable in light of the facts noted below indicating institutional knowledge concerning the location of the Disputed Securities approximately two months prior to the bar date for filing proofs of claim.

The meeting minutes from the July 14, 2009 FirstBank Management Investment and Asset Liability Committee reflect that FirstBank learned from JPMorgan Chase and understood at least as early as that date that its "collateral was transferred to Barclays on September 18, 2008." BCI Facts ¶ 64. Around the same time, FirstBank's general counsel was informed by counsel to the SIPA Trustee that three of the 23 CUSIPS constituting the Posted Collateral had

---

[11] FirstBank filed a customer claim against LBI identifying the Purchased Collateral among the securities it sought to recover. BCI Facts ¶ 69. The SIPA Trustee denied the claim as duplicative. Id. ¶ 72. The Court is aware that FirstBank's customer claim against LBI is subject of a separate litigation; that litigation is not currently before the Court.

11

been transferred to a BlackRock entity, and not to Barclays.[12] Id. On July 24, 2009, FirstBank filed a Rule 2004 Motion seeking discovery as to its collateral; the motion was adjourned without date after FirstBank obtained information as to the location of its property. Case No. 08-13555, ECF Nos. 4485, 5085.

FirstBank has not asserted any claim against BlackRock or any other third party that may have received any of the posted CUSIPs that were not subject to the LBSF-LBI Repos. BCI Facts ¶ 77. On April 15, 2010, FirstBank received an attachment to a pleading filed by Barclays in this litigation in the District Court that revealed relevant excerpts from Schedule A. BCI Facts ¶ 43; Stip. ¶ 28. Prior to that date, FirstBank did not have formal notice that the Disputed Securities were listed on Schedule A. Stip. ¶ 29.

## *Discussion*

The definition of the term Purchased Assets is an issue of central importance in the hundreds of pages of briefing submitted and the more than two hours of oral argument presented in connection with this dispute. Properly applying that definition is the dispositive factor in determining whether transfer of the Disputed Securities to Barclays now can be effectively challenged.

The Court has no difficulty in finding that the Disputed Securities properly are catalogued as Purchased Assets. This is true notwithstanding the various transfers that allowed these CUSIPs claimed by FirstBank to be swept into the September 18 Repurchase Agreement and listed on Schedule A. The transfers that allowed the Disputed Securities to be captured by

---

[12] FirstBank has stipulated that it is not pursuing any claims against Barclays as to any securities other than those that constitute Posted Collateral that Barclays received from LBI or LBHI (or any of their subsidiaries or affiliates) under the APA, the Clarification Letter, Schedule A or otherwise. Stip. ¶ 30. FirstBank quarrels, however, with Barclays' assertion that Barclays received the Disputed Securities and no other securities that comprised the Posted Collateral. FirstBank relies on an e-mail from a Barclays employee stating "We hold the following collateral" and listing all 23 of the securities included within the Posted Collateral. FirstBank Br. Opp'n 20; Stip. ¶ 36, Ex. 12. Because this adversary proceeding is governed by the Sale Order, any statements made in emails are irrelevant and have no bearing on the outcome.

12

the Fed Repo and then by the September 18 Repurchase Agreement with Barclays were all ordinary course securities transactions that took place prior to the Collateral Use Cutoff Date. These transactions included permitted internal repos within Lehman that moved the securities from LBSF to LBI and additional transfers involving LBI that took place in connection with the financing of LBI's operations by the New York Fed and ultimately by Barclays.  In a domain of swaps and repos where assets are used routinely for financing purposes unless prohibited by contract, the fact that the Disputed Securities in question permissibly moved from one legal entity to another to secure short term financing for Lehman's broker dealer business is not the least bit surprising.  In this setting, the fact that these securities ended up in Barclays' hands at a time of financial crisis is not actionable due to the protections afforded by the Sale Order to Barclays as purchaser of Lehman's assets.

FirstBank misreads the Clarification Letter in arguing that the Disputed Securities should be deemed excluded from the sale to Barclays.  That argument disregards both the literal text of the Clarification Letter and the resolution of other similar disputes.  The Court previously has determined in a different context that Barclays, LBHI and LBI expressly contemplated that the securities received by Barclays under the terms of the September 18 Repurchase Agreement would be treated as Purchased Assets.  *See In re Lehman Brothers Holdings Inc.*, 445 B.R. at 170-72 (describing negotiation of September 18 Repurchase Agreement and noting that, under the terms of the Clarification Letter "all securities and other assets held by [Barclays] under the [September 18 Repurchase Agreement]" were to be deemed Purchased Assets and, accordingly, "all of the collateral pledged in connection with the September 18 Repurchase Agreement … was transferred to Barclays"); *Evergreen Solar*, 2011 Bankr. LEXIS, at *10 ("The Clarification Letter specifically provided that the rights and obligations of the parties under the [September 18

13

Repurchase Agreement]… would terminate, and all securities held by Barclays under the [September 18 Repurchase Agreement] would be deemed part of the Purchased Assets").

Regardless of the Court's earlier interpretations of the Clarification Letter noted above, the Disputed Securities indisputably are Purchased Assets. Consistent with controlling language of the Swap Agreement, these securities permissibly were allowed to migrate from LBSF to LBI pursuant to the LBSF-LBI Repos. Importantly, the individual securities at issue were all identified by CUSIP number and placed within the designated pool of financial assets that was transferred to Barclays in accordance with the Sale Order. Stip. ¶ 20. All of these assets were in the acquired pool, and there appears to be no basis to distinguish their treatment as Purchased Assets in light of the very same reasoning stated in this Court's decision in *Evergreen Solar*. The securities, quite simply, were freely transferable.

Despite the high hurdle presented by this precedent, FirstBank urges that the Disputed Securities should be deemed Excluded Assets rather than Purchased Assets because (i) Barclays did not purchase the derivatives business of LBSF, (ii) FirstBank's account with LBSF was not transferred to Barclays in connection with the Sale Transaction and (iii) the definition of "Excluded Contract" in the Clarification Letter covers, *inter alia*, "any ISDA Master Agreement." FirstBank Br. Supp. 14-18. However, these arguments are flawed and miss the explicit language in the Clarification Letter that plainly defines the securities in question as Purchased Assets.

In addition to deeming all securities held by Barclays under the September 18 Repurchase Agreement to be Purchased Assets, the Clarification Letter expressly carves out the securities listed on Schedule A (including the Disputed Securities) from the definition of Excluded Assets. Thus, the language as written takes pains to make clear that the assets on

14

Schedule A may not be classified as Excluded Assets.  Paragraph 1(c) of the Clarification Letter specifically provides that "[t]he following shall also be Excluded Assets:  All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans, *other than those subject to the [September 18 Repurchase Agreement] … .*"  Morag Decl. Ex. 22 ¶ 1(c) (emphasis added).  This language, fairly read, simply does not allow for the result-driven interpretation proposed by FirstBank.  The Disputed Securities are Purchased Assets, and this is true despite FirstBank's ongoing claim to an ownership interest.

Asserting ownership with respect to the book entry mortgage-backed securities at issue here is not the same as a claim for the return of a unique asset such as a Picasso painting.  This dispute may seem to be about specified or traceable property, but it is really about money.  In practical terms, FirstBank is pursuing a claim against Barclays for money damages associated with the default of LBSF under the Swap Agreement in failing to deliver the Disputed Securities to FirstBank as pledgor, but that claim cannot be made against Barclays because of the provisions of the Sale Order.

Oddly, FirstBank's most direct claim for recovery is one that it knowingly chose not to make: a proof of claim against LBSF based on its breach of the Swap Agreement in failing to return the Disputed Securities.  *See Hennequin v. Clews*, 111 U.S. 676, 682 (1884) (noting that a creditor who holds collateral is bound by its contract "to return it when its purpose as security is fulfilled; but if [it] fails to do so, it is only a breach of contract …").  If such a claim had been made, damages presumably would be calculated in an amount equal to the market value of these securities.  *See*, *e.g.*, *Carco Group, Inc. v. Maconachy*, 383 F. App'x 73, at *3 (2d Cir. 2010) (explaining that, in an action for breach of contract, "general damages seek to compensate the

15

plaintiff for 'the value of the very performance promised,' often determined by the market value of the good or service to be provided" (*quoting Schonfeld v. Hilliard*, 218 F.3d 164, 175-76 (2d Cir. 2000))).

As to the claims of FirstBank, Barclays is off the hook. The Sale Order provides that Barclays is "entitled to all of the benefits and protections afforded by Bankruptcy Code Section 363(m)." Stip. Ex. 8 ¶ 18. Section 363(m) gives purchasers of a debtor's assets an "assurance of finality" with respect to "who has rights to estate property." *In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997) (citations omitted); *see also Lawrence v. Wink*, 293 F.3d 615, 622 (2d Cir. 2002) (noting the Second Circuit's reluctance to "open the floodgates to future litigation attacking the final orders of sale in bankruptcy court proceeding, a forum where finality of court orders is particularly important") (citations omitted); *United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (conclusion to uphold terms of sale under Section 363(m) "furthers the policy of finality in bankruptcy sales"); *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 286 (7th Cir. 2002) (stating that a bankruptcy sale order may be collaterally attacked only "within the tight limits" of Federal Rule of Civil Procedure 60(b)).

Paragraph 7 of the Sale Order enjoins the assertion of any claims against Barclays relating to or arising out of its purchase of the Purchased Assets and provides that:

> [e]xcept as expressly permitted by the [APA] or by this Sale Order, all persons and entities … holding Interests or Claims of any kind or nature whatsoever against or in [Lehman] or [Lehman's] interests in the Purchased Assets … arising under or out of, in connection with, or in any way relating to, [Lehman], the Purchased Assets, the operation of [Lehman's] businesses before the Closing Date or the transfer of [Lehman's] interests in the Purchased Assets to [Barclays], shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against [Barclays] … such persons' or entities' Interests or Claims.

Stip. Ex. 8 ¶ 7.

16

The Sale Order also includes specific findings by the Court that LBI had "all of the … authority necessary to consummate" the Sale Transaction. Stip. Ex. 8 ¶ G. Given the important policy of finality in bankruptcy sales, the Sale Order channels a remedy for parties like FirstBank who claim an interest in the Purchased Assets. In particular, "all such Claims and Interests … shall be, and hereby are transferred and attached to [Lehman's] interests in the Sale proceeds." Stip. Ex. 8 ¶ 7.

Therefore, FirstBank's claims against Barclays are prohibited by the Sale Order. That unambiguous final order was structured purposefully to protect the purchaser from claims such as these. Barclays purchased the Disputed Securities in good faith and has the right to retain them. They fit the definition of Purchased Assets, and Barclays is expressly entitled to rely on all of the immunities and protections of the Sale Order.

There is no need to address at length certain other arguments presented by the parties with respect to the Disputed Securities – the argument that Barclays is protected by Article 8 of the Uniform Commercial Code and the contention of FirstBank that the Posted Collateral was not property of the Lehman estate.[13] Because the Court finds that the Sale Order bars FirstBank's claims, it follows that there is no issue for trial and that Barclays is entitled to judgment as a matter of law with respect to the surviving claims.

---

[13] The question of ownership of the Disputed Securities is a red herring. Regardless of the validity of FirstBank's claims to the Disputed Securities, LBI had the legal right to unrestricted use of these securities by reason of the Lehman MRA. It was proper under the circumstances to include them in the Fed Repo. Eventually, the Disputed Securities were transferred to Barclays under the terms of the September 18 Repurchase Agreement. Barclays, as purchaser, was entitled to rely on the APA, the Clarification Letter, the content of Schedule A and the Sale Order. FirstBank's articulation of an adverse ownership claim to collaterally attack the finality of this sale is plainly not permitted under the Sale Order.

17

*Conclusion*

Barclays' Motion for Summary Judgment is granted, and FirstBank's Motion for Summary Judgment is denied. Barclays is directed to submit an order consistent with this Memorandum Decision.

SO ORDERED.

Dated: New York, New York
May 10, 2013

                                      *s/ James M. Peck*
                                      Honorable James M. Peck
                                      United States Bankruptcy Judge